IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


| | | |
|---|---|---|
| ANTHONY PELLERIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-1654 |
| | § | |
| WILLIAMS COMPANY, WILLIAMS | § | |
| ENERGY SERVICES, LLC, and | § | |
| DISCOVERY PRODUCER SERVICES, | § | |
| LLC, | § | |
| | § | |
| Defendants. | § | |


MEMORANDUM AND ORDER


Pending is Defendants The Williams Companies, Inc.'s and

Williams Energy Services, LLC's Motion for Summary Judgment

(Document No. 20) and Plaintiff Anthony Pellerin's Motion to

Reconsider Plaintiff's Motion for Continuance Under Rule 56(f)

(Document No. 26).[1]  After carefully considering the motions,

responses, and the applicable law, the Court concludes as follows:


I.  Background


This case involves claims of racial discrimination,

retaliation, and harassment under 42 U.S.C. § 1981 ("§ 1981").  In

March 1998, Plaintiff Anthony Pellerin ("Plaintiff") began working

as a temporary employee for Williams Communications Solutions

---

[1] Named defendant Discovery Producer Services, LLC ("DPS") has
not been served, and is therefore DISMISSED without prejudice for
want of prosecution.

("WCS"), then a subsidiary of Defendant The Williams Companies, Inc. ("TWC"), and was subsequently employed in a permanent customer service position.  *See* Document No. 20 exs. A; B; C; D at 62-65. In June 2001, Williams Gas Pipeline Transco ("WGPT"), another TWC subsidiary, offered Plaintiff employment as a Temporary Offshore Environmental Inspector for a Gulfstream project in Houston, Texas. Id. exs. D at 84; F.  When the Gulfstream project concluded in March 2002, Plaintiff's temporary position was eliminated, and Plaintiff was informed that there were no other open positions. Id. exs. D at 84-88; H.  Thus, Plaintiff entered into a severance agreement with WGPT, and Plaintiff's name was placed into TWC's redeployment pool.  Id. exs. D at 84-85; G; H.

On April 24, 2002, Plaintiff applied for a technician position with DPS.  Id. exs. D at 88-89; I.[2]  The following month, after Defendant Williams Energy Services, LLC ("WES") took over operation of the DPS system, WES hired Plaintiff for an open Operations Technician Trainee position at DPS's plant in Larose, Louisiana, where Plaintiff's immediate supervisor was Mechanical Supervisor Bill LeGrange ("LeGrange"), a white male.  Id. exs. D at 90, 107;

---

[2] As part of the application process, Plaintiff completed an Applicant Data Record, on which he identified his ethnicity as "American Indian/Alaskan."  Document No. 20 exs. D at 88-89; J. Plaintiff later completed an "Employee Data Form/Personal Data" form, on which he wrote "Am. Indian" in the box entitled "Ethnic Group."  Id. exs. D at 100; L.

K; P ¶ 2.[3]   As an operations technician trainee, Plaintiff's primary job duty was to perform maintenance repairs on plant equipment with which the operations workers found problems.   Id. exs. D at 103; O at 21-22.[4]   Shortly after Plaintiff was hired, however, DPS Manager Frank Fort ("Fort") instructed LeGrange to assign someone to ensure that DPS's safety guidelines were being followed by contractors who were installing new compressor equipment at the plant.   Id. ex. O at 38-39, 82-84.   Because Plaintiff's resume indicated that he had worked in a safety position on the Gulfstream project, LeGrange temporarily assigned Plaintiff to be an Operations Safety Liaison.   Id. exs. D at 103-106; O at 38-39, 82-83.   When the compressor installation project was completed, LeGrange determined there was a greater need for maintenance technicians at the Paradis plant, so he transferred Plaintiff there to begin working in the operations technician

---

[3] WES is a wholly-owned subsidiary of TWC.   Document No. 20 ex. M ¶ 2.

[4] According to WES, "[a]n essential job duty of all Operations Technician positions is the completion of the lock out/tag out ('LO/TO') procedure," which is "an industry procedure for safely securing equipment before maintenance is performed."   Document No. 20 at 4.   In his affidavit, LeGrange explains that during a LO/TO procedure, the energy source for a given piece of equipment is shut down in a specific way to ensure safety, and the equipment is then locked and tagged to describe the details of the shut down.   Id. ex. P ¶ 3.   LeGrange also states that an incorrectly performed LO/TO procedure can cause significant and serious safety concerns for all equipment and employees.   Id. ¶ 4.

trainee position for which Plaintiff had originally been hired. Id. exs. D at 106-07.

LeGrange then assigned Toby Templet ("Templet"), an Operations Technician in maintenance at the Paradis plant, to provide Plaintiff with on the job training.  Document No. 23 exs. B at 33-35; J ¶ 7.[5]  According to Plaintiff, however, Templet did not provide him with training and was in fact "not competent in performing his daily tasks."  Id. ex. J ¶ 8.  Plaintiff also alleges that he witnessed Templet engage in unsafe work practices. For example, Plaintiff asserts that "[o]n one occasion, Templet[] created a cloud of gas in the plant by opening a compressor valve that should not have been opened," such that "the slightest fire could have blown the entire plant and the workers inside."  Id. ¶ 9.[6]  On another occasion, Plaintiff became involved in a dispute with Templet after Plaintiff questioned the equipment of an acid truck driver who was delivering acid to the plant.  Document No. 20 ex. O at 165-70; Document No. 23 ex. J ¶ 10.  Templet reported the incident to LeGrange, and Plaintiff alleges that LeGrange advised

---

[5] According to WES, there are two categories of operations technicians: those who work in maintenance, and those who work in operations.

[6] Plaintiff testified in his deposition that Mike Aberdee ("Aberdee") was present when this incident occurred and was the supervisor responsible for reporting the incident to LeGrange.  See Document No. 23 ex. A at 186-89.  Plaintiff further testified that he did not personally report the incident to LeGrange, and that he does not know if Aberdee or anyone else did.  Id.

Plaintiff that he was no longer in a safety position and instructed him to stop worrying about safety and to focus on learning his current maintenance job. Document No. 20 ex. O at 169-70; Document No. 23 ex. J ¶ 11.[7]

According to LeGrange, Plaintiff subsequently came to him and indicated that he did not want to be in maintenance full time but instead wanted to be a safety representative. Document No. 20 ex. Q. When LeGrange explained that there were no available safety positions on the project, Plaintiff indicated that as an alternative, he wanted to be placed into an operations position. Id. LeGrange responded that he would attempt to move Plaintiff to the Larose plant to be trained as an outside operator for relief, and in the meantime, LeGrange instructed Plaintiff to resume his training on compressor maintenance with Robert Gisclair ("Gisclair"), an Operations Technician II in maintenance. Document No. 20 exs. O at 30, Q; Document No. 23 ex. J ¶ 13. Plaintiff contends, however, that he still did not receive adequate training, despite "numerous consistent requests to LeGrange to be assigned to someone who could properly train [him] on all the duties and

_____

[7] Plaintiff asserts that he reported LeGrange's instruction (not to worry about safety) to Fort, who then met with LeGrange. Document No. 23 ex. J ¶ 1. Thereafter, Plaintiff alleges, he "noticed that LeGrange began to treat [him] in a discriminatory manner." Id. For example, Plaintiff alleges that LeGrange subsequently invited all of the operations technicians except Plaintiff to a company lunch, and when Plaintiff heard about the lunch and attended anyway, LeGrange paid for everyone's lunch except Plaintiff's. Id. ¶ 12.

responsibilities of the operation technician position." Document
No. 23 ex. J ¶ 14.

According to LeGrange, due to Plaintiff's continued indication
that he did not want to work in maintenance, LeGrange decided in
early September 2002 to transfer Plaintiff back to the Larose
plant, where he would be placed with outside operators for training
in operations. *See* Document No. 20 exs. O at 25-26, 38; Q.   On
September 17, Plaintiff was assigned to work with Operations
Technicians III Matt Kay ("Kay") and Duane Smith ("Smith").   Id.
exs. O at 57-58; Q.   A couple of days later, Operations Supervisor
Ray Tennent ("Tennent") met with Kay to discuss Plaintiff's
progress in operations, and Kay informed Tennent that he did not
believe Plaintiff was ready to work independently.   Id. ex. Q.
Around the same time, WES alleges, it became aware of problems with
Plaintiff's time sheets and work shifts. *See* Document No. 20 at 7-
8; exs. O at 47, Q, U ¶ 3.

On October 21, 2002, Kay instructed Plaintiff to remove a
LO/TO on a product pump and open the suction and discharge valves
to that pump.   Document No. 20 exs. O at 59-60, Q; Document No. 23
ex. J ¶ 17.   According to WES, Plaintiff failed to perform the
proper LO/TO procedure and "inexplicably opened an equalizing valve
between products tanks, which created dangerous working conditions
and caused the plant to shut down." Document No. 20 at 8; ex. O at
59-62.   Plaintiff insists, however, that he "strictly followed

6

Kay's instructions, without variance," and that it was Kay's instructions that caused the plant shutdown.  Document No. 23 ex. J ¶ 17.  Plaintiff asserts that he notified Human Resources ("HR") that he was "not at fault for the plant shut down" and that Kay and LeGrange had "erroneously documented this in [his] file."  <u>Id.</u> Plaintiff also states that he "then complained to management, specifically Mike Snodgrass ["Snodgrass"] and Frank Fort that [he] believed [he] was being set-up, harassed, and discriminated against because of [his] race.  <u>Id.</u>

On October 25, 2002, Kay and Lead Operations Technician Wayne Babin ("Babin") approached LeGrange "about their concerns that Plaintiff was not acquiring the necessary skills to perform as an Operator Technician in a safe manner."  Document No. 20 at 8; exs. O at 155; Q.  On October 30, 2002, LeGrange issued a disciplinary action letter to Plaintiff that addressed two issues: (1) falsified time sheets, and (2) safety concerns regarding Plaintiff's work performance.  <u>Id.</u> exs. D at 147; O at 55; T.  The letter also informed Plaintiff that it included "a list of training you need to be proficient in by November 22, 2002"; that "an assessment of your skill level will be conducted to determine your progress toward attaining the skills and knowledge necessary to remain employed in your position"; and that "[f]ailure to successfully acquire the necessary skills to qualify you to perform the duties of your job, by the required date, will result in the

7

termination of your employment." <u>Id.</u> ex. T.[8]  After receiving the
letter, Plaintiff contacted Snodgrass, the Human Resources Business
Partner assigned to WES, and Mary Walrond, also in HR, and
complained that he felt like he was being harassed and was not
part of the team.   <u>Id.</u> ex. U ¶¶ 1, 3-4.  Plaintiff avers in his
affidavit that he complained to HR, Snodgrass, and Fort "that [he]
was being discriminated against because of [his] race but to no
avail."  Document No. 23 ex. J ¶ 19.

On December 2, 2002, Babin administered the test to Plaintiff.
Document No. 20 exs. D at 159, O at 156; Document No. 23 ex. J
¶ 24.[9]  Plaintiff states that he "passed the lock out/tag out on
the old compressor" but "LeGrange alleged that [he] did not pass
some other minor items on the test that [he] was never trained on."

_____

[8] Upon further investigation, WES concluded that Plaintiff had
in fact been present at work on some of the dates listed in the
disciplinary letter.  <i>See</i> Document No. 20 exs. O at 47-48, 159-63;
Q.  Accordingly, LeGrange issued a second letter to Plaintiff
apologizing for the error and stating that the disciplinary action
letter would be rescinded and a revised disciplinary letter would
be issued.  <u>Id.</u> exs. D at 157-58; O at 48-49; Q; V.  LeGrange
issued the revised disciplinary letter on November 14, 2002,
reiterating the safety and work performance concerns and setting
November 22 as the date on which Plaintiff would be given an
assessment test on twenty skills relevant to the operations
technician position.  <u>Id.</u> ex. W.  The assessment test was later
rescheduled for December 2, 2002.  <u>Id.</u> exs. D at 158-59; Q; X.

[9] According to WES, this assessment test "was given to all new
Operations Technicians who were not familiar with the outside
operations of the plant, including white employees."  Document
No. 20 at 10; exs. O at 64, P ¶ 5.  WES also contends that
Plaintiff was provided with opportunities to receive additional
training before the test date, but he declined any such training.
<u>Id.</u> exs. N ¶ 5; P ¶ 5.

Document No. 23 ex. J ¶ 24. According to LeGrange, however, Babin concluded that Plaintiff was deficient in eleven of the twenty skills. Document No. 20 exs. N ¶ 5; P ¶ 5; Q; X. LeGrange then presented Plaintiff with a final disciplinary action letter. Document No. 20 exs. O at 155-56, Q, Y; Document No. 23 ex. J ¶ 5. The letter provided Plaintiff with a written assessment of his performance during the test, listed the skills that required improvement, and provided for retesting on December 16, 2002. Id. On December 14, 2002, LeGrange informed Plaintiff that the LO/TO test would be on one of the flash gas compressors. Id. ex. Q. Plaintiff contends that he "could not adequately prepare for the portion of the assessment test that required a [LO/TO] on the new compressor" because LeGrange refused to give Plaintiff certain information that he needed. See Document No. 23 ex. J ¶ 25.

On December 16, Kay administered the second test. Id. ¶ 26. According to Plaintiff, Kay instructed him to perform the LO/TO on the new compressor, but "Kay did not even know all the [LO/TO] procedures on the new compressor because [he] had to ask someone else whether [Plaintiff] was performing the procedures correctly." Id. Nonetheless, Plaintiff asserts that he "correctly performed the procedure on all but one minor valve," yet Kay "stopped [him] and refused to allow [him] to complete the remaining portions of the assessment test." Id. ¶ 27. According to WES, however, "Plaintiff performed the tasks in such a deficient manner that he

9

created an unsafe condition and the testing was terminated." Document No. 20 at 11; exs. N ¶ 6, P ¶ 6, Q. Later that day, WES offered Plaintiff an opportunity to resign his employment with two weeks' pay, but Plaintiff did not respond to the offer and his employment was terminated. Id. exs. N ¶ 6; P ¶ 6; Q; U ¶ 5.

In his Second Amended Complaint, Plaintiff alleges that he was "demoted, harassed, terminated, and/or constructively discharged by Defendants" in retaliation for having "opposed unlawful employment practices by informing Defendants' managers that there were problems with unequal treatment of Plaintiff and other African American employees and complaining] internally and fil[ing] charges with the EEOC," in violation of § 1981. Document No. 14 ¶¶ 13, 19-23. Plaintiff further alleges that Defendants "have harassed Plaintiff because of his race in making his working conditions intolerable for an ordinary reasonable person and subjecting him to hostile work environments." Id. ¶ 12.[10] Defendants construe Plaintiffs complaint as asserting § 1981 claims for discriminatory discharge, retaliatory discharge, and racial harassment. See Document No. 20. Defendants move for summary judgment on each of these claims, asserting that: (1) Defendant TWC was not Plaintiff's

---

[10] Plaintiff also alleges that he was subjected to other discriminatory practices, including discrimination in compensation and discrimination in promotions. See Document No. 14 ¶¶ 1, 10-11, 14-18. Plaintiff does not defend these claims in his response brief. Because there is no summary judgment evidence to raise issues of fact on these claims, they are DISMISSED on summary judgment.

employer; (2) Plaintiff cannot establish a prima facie case of race discrimination or retaliation; (3) even if Plaintiff makes a prima facie case on his claims, he cannot raise a fact issue that WES's legitimate business reasons for its decision to discharge him were pretextual; and (4) Plaintiff has failed to raise a fact issue that he suffered racial harassment.

## II.   Summary Judgment Standard of Review

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice.  Id.  "[T]he nonmoving party must set forth

11

specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993) (citing Matsushita, 106 S. Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

## III.  Discussion

### A.  Plaintiff's Motion to Reconsider

As an initial matter, Plaintiff asks the Court to reconsider Magistrate Judge Stacy's Order filed October 13, 2005, denying Plaintiff's "Rule 56(f) Motion to Compel Discovery." Objections to

an order of the Magistrate Judge must be filed in the District Court within ten days after the entry of the order.  *See* FED. R. CIV. P. 72(a).  Plaintiff's objections were therefore due not later than October 27, 2005, but were not filed in the form of the pending motion until November 14, 2005.  *See* Document No. 26. Plaintiff's Motion to Reconsider Plaintiff's Motion for Continuance Under Rule 56(f) (Document No. 26) is therefore DENIED.

B.   <u>Plaintiff's Claims Against TWC</u>

TWC moves for summary judgment on the ground that it was not Plaintiff's employer and "did not make final decisions regarding employment matters related to Plaintiff."  *See* Document No. 20 at 16.  Four factors are considered to determine whether WES and TWC should be treated as a single employer:  (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control.  <u>Johnson v. Crown Enters., Inc.</u>, 398 F.3d 339, 343 (5th Cir. 2005) (quoting <u>Trevino v. Celanese Corp.</u>, 701 F.2d 397, 404 (5th Cir. 1983)). "The second factor has been refined to an inquiry about "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination.'"  <u>Id.</u>  "This factor, furthermore, has been called the most important one." <u>Johnson</u>, 398 F.3d at 343.

In support of his contention that TWC and WES are a single enterprise, Plaintiff cites the following evidence: (1) Plaintiff's May 2002 Employee Data Form and April 2002 drug test consent form, both of which contain a "Williams" business logo; (2) the "Williams Invention and Confidential Information Agreement" signed by Plaintiff in May 2002, which states in relevant part that "[i]n consideration of [Plaintiff's] employment or the continuation of same, by The Williams Companies, Inc., a Delaware corporation, and/or its related companies, hereinafter referred to as 'Company,' Plaintiff agrees to several confidentiality provisions; (3) WES's response to Plaintiff's EEOC charge, wherein WES referred the EEOC to the TWC's Human Resources website for WES's anti-discrimination policies; and (4) the fact that WES is a wholly-owned subsidiary of TWC. *See* Document No. 22 at 13-14; Document No. 23 exs. D, E, F, G-1. More importantly, however, the summary judgment record contains evidence that a TWC employee was involved in the final decisions regarding employment matters related to Plaintiff. As Defendants themselves admit, Snodgrass-the TWC employee "assigned to provide human resources advice, counsel, and support" to WES-- was one of the decision makers responsible for terminating Plaintiff's employment. *See* Document No. 20 exs. O at 132; U ¶¶ 1, 5. Thus, there is at least some evidence of centralized control of employment and labor relations, such that TWC is not entitled to summary judgment on this issue.

14

C.   <u>Plaintiff's Discrimination and Retaliation Claims</u>

Employment discrimination and retaliation claims brought under § 1981 are analyzed under the same framework that applies to claims brought under Title VII of the Civil Rights Act of 1964.  *See* <u>Robertson v. Alltel Info. Servs.</u>, 373 F.3d 647, 651 (5th Cir. 2004).  Because Plaintiff presents no direct evidence of racial discrimination, his claims are subject to the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 93 S. Ct. 1817 (1973).  *See* <u>Davis v. Dallas Area Rapid Transit</u>, 383 F.3d 309, 316 (5th Cir. 2004).  Under this framework, the plaintiff must first create a presumption of intentional discrimination or retaliation by presenting evidence of a prima facie case.  <u>Id.</u> at 317.  The burden then shifts to the employer to articulate a legitimate, non-retaliatory or non-discriminatory reason for the underlying employment action.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 120 S. Ct. 2097, 2106 (2000).  The burden on the employer at this stage "is one of production, not persuasion; it 'can involve no credibility assessment.'"  <u>Id.</u> (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 113 S. Ct. 2742, 2748 (1993)).

If the employer sustains its burden, the inference of discrimination or retaliation falls away, and the burden shifts back to the plaintiff to establish that the employer's proffered reason is merely a pretext for discrimination or retaliation.  *See* <u>Davis</u>, 383 F.3d at 317.

15

1.   <u>Plaintiff's Prima Facie Case</u>

Plaintiff contends that WES in discharging him discriminated against him because he is African American and retaliated against him for having complained about racial discrimination.   To establish a prima facie case of discriminatory discharge, Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class, or others similarly situated were treated more favorably.   *See* <u>Wheeler v. BL Dev. Corp.</u>, 415 F.3d 399, 405 (5th Cir. 2005); <u>Okoye v. Univ. of Tex. Houston Health Sciences Ctr.</u>, 245 F.3d 507, 512-13 (5th Cir. 2001).   To establish a prima facie case of retaliation, Plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action.   *See* <u>Davis</u>, 383 F.3d at 319; <u>Foley v. Univ. of Houston Sys.</u>, 355 F.3d 333, 340 n.8 (5th Cir. 2003).

Plaintiff avers in his affidavit that his race is Native American and African American, *see* Document No. 23 ex. J ¶ 17, which provides some evidence that he <u>is</u> a member of a protected class as alleged in his Second Amended Complaint.[11]   Plaintiff also

---

[11] Although it is undisputed that Plaintiff is Native American, Plaintiff alleges in his Second Amended Complaint only that he was

has presented at least some evidence that he was qualified for the Operation Technician Trainee position he held, that he was terminated, and that he was replaced by Clint Landry, a white male. *See* Document No. 23 exs. B at 19-20; J ¶ 29.[12]   WES does not challenge Plaintiff's evidence, and Plaintiff has therefore met his initial burden on the race discrimination claim.   Likewise, Plaintiff has presented at least some evidence on each of the elements to establish a prima facie case of retaliation.

    2.   <u>WES's Legitimate, Non-Discriminatory/Non-Retaliatory</u>
          <u>Reason and Plaintiff's Evidence of Pretext</u>

    After review of the summary judgment evidence, the Court finds that a question of fact has been raised on whether WES's proffered reason for Plaintiff's termination--safety concerns--was the real reason for the termination.   The summary judgment record contains at least some evidence that: (1) Plaintiff had been assigned and

_____

discriminated against because he is African American. *See* Document No. 14.   Because Plaintiff has neither pleaded nor presented any evidence that he was discriminated against for being an American Indian, Plaintiff's status as an American Indian is not relevant to his § 1981 claims.

   [12] With respect to the fourth element, Plaintiff also argues that white employees received more favorable treatment than he did. Specifically, Plaintiff asserts that (1) he was the only employee required to take an assessment test in order to remain in his position, and (2) although WES terminated him allegedly for being a safety concern, WES neither reprimanded nor terminated Templet, a white employee who Plaintiff asserts "was a prime example of a safety concern," until long after Plaintiff was terminated. Document No. 22 at 17.

had successfully performed at least some safety functions during his employment with WES; (2) Plaintiff informed the decision makers that he was not responsible for the October 2002 plant closure; (3) Plaintiff was the only employee required to take and pass an assessment test to retain his employment with WES; and (4) Plaintiff properly performed the LO/TO procedure on his first assessment test.   Fact issues therefore exist as to whether the decision makers actually perceived Plaintiff to be a safety risk and whether they undertook a course of conduct that was designed to secure his termination, either because of his race or because of his complaints of discrimination.   Summary judgment will therefore be denied on the discrimination and retaliation claims.   *See* Reeves, 120 S. Ct. at 2108 (holding that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation").

D.   Plaintiff's Hostile Work Environment Claim

Plaintiff also contends that he was subjected to a racially hostile work environment.   To establish a prima facie case on this claim, Plaintiff must show that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment affected a term, condition, or privilege of employment, and (5) WES knew or should have known of the harassment, yet failed to take

prompt remedial action.  Felton v. Polles, 315 F.3d 470, 483-84 (5th Cir. 2002).  In determining whether a workplace constitutes a hostile work environment, courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 114 S. Ct. 367, 371 (1993).  For harassment to actionable, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002); see also Walker v. Thompson, 214 F.3d 615, 625 (5th Cir. 2000) ("[Plaintiff] must show that the discriminatory conduct was severe or pervasive enough to create an objectively hostile or abusive work environment.").

Plaintiff testified in his deposition that he was harassed by Kay, Aberdee, and Nick Arcement ("Arcement"), an operations technician at the Larose plaint, because of his race.  When asked to provide specific instances of harassment, however, Plaintiff provided only one example--a statement allegedly made by Arcement while watching a football game on television:

> Q:  Okay.  Now, Nick [Arcement], you mentioned that--you said that [he] had a role in your termination.  What was [his] role?
>
> A:  . . . . [I]t was difficult to communicate.  He acted like he didn't want to communicate with me ever and--where he was supposed to talk to me and explain to me

about the plant.  And he's supposed to be my, you know,
senior person or--you know, while we're--I'm in training,
operation trainee.  He made derogatory statements about
blacks.  He made comments about how they, you know--they
just didn't, you know, fit in his program to be in
existence, you know.  The kind of inference that he made.

And I can see that, you know, by discussing--just hearing
him talk with the other operator who was of him [sic]
same ethnicity, which was Danny Long.

. . .

Q:  [Arecement] was not somebody that performed perfor-
mance  evaluations  or  issued  disciplinary  actions,
correct?

A:  No.

Q:  Now, [Arcement], he also made derogatory comments
about blacks.  What did you hear him say?

A:  At one time they had a football game on and he said
something to the effect about how, "The n_____ is sorry.
They ought to get rid of him," and all of that.

Q:  Okay.  What else did [Arcement] say?

A:  He--he  just--that--I  can't  vividly  recall  that
incident--when he--during the football game that we had
on, on the screen over there that the senior operator was
in there watching.  And he just didn't--I mean, he didn't
care for minorities.

Q:  Okay.

A:  Period.

Q:  . . . . But I'm trying to understand what else did
[Arcement] say when you say "derogatory about black
people."  You mentioned the football game?

A:  Yeah.  That's about the only one incident that I
heard from him.

. . .

Q:  Who was present when he made that statement?

20

A:   Danny was the--one of the senior operators at the
time.

Q:   Okay.  Anybody else?

A:   No, just myself and us three.

Q:   When did that happen?

A:   In the early part of 2002.

Q:   Who did you report it to?

A:   I didn't report it to anyone.

Document No. 23 ex. B at 170-72.  *See* Document No. 23 ex. J ¶ 15.

Although discriminatory verbal intimidation, ridicule, and insults

may be sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment,

*see*, *e.g.*, Wallace, 80 F.3d at 1049, the "mere utterance of an

. . . epithet which engenders offensive feelings in an employee"

does not, *see* Harris, 114 S. Ct. at 370.  The summary judgment

evidence is that Arcement's statement was an isolated one, and even

assuming that it rises to the level of racial harassment, there is

no evidence that WES and/or any of Plaintiff's supervisors knew or

should have known about it.

Plaintiff also argues that he suffered racial harassment when

LeGrange allegedly "invited all the operator technicians and

contractors to a company sponsored lunch but did not invite"

Plaintiff.  Document No. 23 ex. J ¶ 12.  Plaintiff contends that he

"went to the luncheon with no idea that [he] was not invited" but

"was not allowed to sit at the table with LeGrange and the other employees," and when "the luncheon was over, LeGrange paid for everyone's lunch except for" Plaintiff's meal. <u>Id.</u> Even assuming this incident constitutes harassment, there is no evidence that LeGrange's actions were in any way related to Plaintiff's race.

Finally, Plaintiff alleges in his brief that "LeGrange intentionally harassed [him] by presenting false allegations against him, . . . disciplining him unjustly, . . . refusing to train him, singling him out for an arbitrary assessment test, and discriminatorily terminating his employment." Document No. 22 at 20. LeGrange's alleged conduct, unaccompanied by racial slurs, derogatory remarks, or race-based comments, does not necessarily constitute racial harassment. Assuming arguendo that it does, however, LeGrange's actions are not the type of "racially discriminatory intimidation, ridicule, and insult" that are "severe or pervasive enough to create an objectively hostile or abusive work environment." <u>Walker</u>, 214 F.3d at 626 (holding that fact issue existed as to racial harassment where evidence was that plaintiffs, both black females, had endured racially offensive remarks for over three years and were subjected to, among other things, comparisons to slaves and monkeys, derisive remarks regarding their African heritage, patently offensive remarks regarding the hair of African-Americans, and conversations in which a co-worker and supervisor used the "n" word). Although LeGrange's

actions may be probative evidence of Plaintiff's discriminatory and retaliatory discharge claims, they are insufficient to permit a reasonable jury to find that Plaintiff was subjected to a work environment that was "permeated with 'discriminatory intimidation, ridicule, and insult.'" <u>Harris</u>, 114 S. Ct. at 370.

In sum, Plaintiff has failed to present evidence that WES's conduct during the months preceding his termination was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, as is required to support a hostile work environment claim.  Accordingly, Defendants are entitled to summary judgment on this claim.

## IV. <u>Order</u>

For the reasons set forth, it is hereby

ORDERED that Plaintiff Anthony Pellerin's Motion for Reconsideration (Document No. 26) is DENIED.  It is further

ORDERED that Defendants The Williams Company's and Williams Energy Services, LLC's Motion for Summary Judgment (Document No. 20) is GRANTED IN PART, and Plaintiff's claims of discrimination in compensation and in promotions, and his racially hostile work environment claim, are all DISMISSED on the merits. The motion is otherwise DENIED.

Remaining to be tried are Plaintiff's claims that his discharge was an act of racial discrimination against him because

he is African American and an act of retaliation against him because he had engaged in the protected activity of complaining about racial discrimination.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas on this 30th day of December, 2005.


EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

24